WESTINGHOUSE ELECTRIC & MF'G. CO. v. BROOKLYN RAPID TRANSIT CO. et al.

(District Court, S. D. New York. January 15, 1919.)

1. STREET RAILROADS ⬦⟹58—RECEIVERSHIP—SETTLEMENT OF DAMAGE CLAIMS—COUNSEL FEES.

Receiver for a large street railway system instructed that it was the policy of the court to make prompt and just settlement of claims for personal injuries, where possible, but that no settlement would be made while a claimant was under contract to pay excessive attorney's fees.

2. STREET RAILROADS ⬦⟹58—RECEIVERSHIP—APPOINTMENT OF CORECEIVERS.

The general purpose of a receivership for a metropolitan street railway system and the duties arising therefrom considered, and in the early stages of such receivership, when the immediate thing desirable is to improve the physical condition of the property, and to increase its operative efficiency, motions by the city and the Public Service Commission for the appointment of additional receivers denied without prejudice.

In Equity. Suit by the Westinghouse Electric & Manufacturing Company against the Brooklyn Rapid Transit Company, the New York Municipal Railway Corporation, and the New York Consolidated Railroad Company. On motion for appointment of coreceiver. Denied.

Walter F. Taylor, of New York City, for plaintiff.

George D. Yeomans, of Brooklyn, N. Y., for Brooklyn Rapid Transit Co.

William P. Burr, Corp. Counsel of New York City, for city of New York.

William L. Ransom, of New York City, for Public Service Commission, First Dist.

Cravath & Henderson, of New York City (Paul D. Cravath and Robert T. Swaine, both of New York City, of counsel), for noteholders, etc.

---

⬦⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

George S. Franklin, of New York City, for War Finance Corporation.

John J. O'Leary, of New York City, for certain claimants.

Arthur J. Stern, of Brooklyn, N. Y., for landowners affected by extension of various elevated railroads.

Eldon Bisbee and Edgar M. Cullen, both of New York City, for committee of stockholders of Brooklyn Rapid Transit Co.

William Erbe, pro se.

MAYER, District Judge. [1] On page 24 of the report to the court, submitted by the receiver, Mr. Garrison, under the heading of "Malbone Street Accident," said:

"On November 1, 1918, a deplorable accident occurred on the Brighton Beach line, at Malbone street, resulting in 94 deaths and 203 persons injured. Prior to my appointment settlements had been made in 12 death cases, and 102 personal injury cases, at an aggregate cost of about $138,000. While only an approximation can be given of the amount of damages still accruing, the sum will probably not be less than $1,100,000. Since my appointment I have authorized the continuation of making settlements up to the point of payment, in order to await the instructions of this court in the premises. Provision will have to be made for raising money to meet these claims, if they are to be paid."

I appreciate fully that persons not familiar with the law, such as those affected by this accident, do not understand court proceedings generally, and do not understand court proceedings of this character. Therefore I make this statement at this time in this formal way, in order that there may be no apprehension on their part, or no mistaken notion which may lodge in their minds. It is the purpose of the court to do everything in its power ultimately to bring about a situation whereby those justly entitled to be compensated for this unfortunate damage to which they have been subjected shall be compensated; and it is the purpose of the court with, as it hopes, the assistance of all who are interested in this receivership, to accomplish such a result as soon as the law and the facts permit it to be accomplished, and the co-operation which the court hopes for aids to that end.

I do not wish any of these unfortunate people to think, as might be suggested to them by persons not familiar with such matters, that any receivership of this kind is for any other purpose than fully to safeguard their rights, and, if possible, accomplish results for them even earlier than the strict legal technique requires, if the co-operation is attained which I hope will be attained.

It is also my purpose to instruct the receiver in respect, not merely of this accident and the claims arising therefrom, but as a general policy in dealing with all accident cases, that from the standpoint of the settlement of cases they shall be advised as to what the expense is to be to the person who is the plaintiff in the case or who makes the claim. I recognize the propriety and necessity of compensation to earnest and diligent counsel who represent any of the persons who are damaged by any injury which may be laid at the door of any of the companies within the receivership, but I am extremely anxious that, in dealing with these unfortunate persons, no situation shall be created which will enhance

the value of those who represent them beyond what is fair and just compensation for representing them; and if there be, perchance, by way of illustration, any 50 per cent. contracts outstanding, I shall not permit the receiver to make any settlement with anybody while such a contract as that is outstanding. I do not attempt to place any specific value upon the services of counsel, because each case stands upon its own merits, and there may be some cases where counsel are justly entitled, by reason of the difficulties, for the trouble, or what not, to a greater compensation than in other cases; but I take this means of letting those concerned know that everything that is just will be endeavored earnestly to be done by the receiver and by this court, and that none of them need be either panicked into an unjust settlement between themselves and the companies, taking less than is fairly and rightly due to them, nor into an undue payment for the obtaining of a settlement.

[2] As far as I can gather from what all the counsel have stated, there is no objection in any quarter to the continuance of the receivership; and as I understood the arguments, their trend inevitably leads to the conclusion that in the interests of all concerned such continuance must be had. Therefore, in so far as the order to show cause is addressed to that subject-matter, an order will be made continuing the receivership pending this litigation.

In respect of the questions of intervention, intervention is permissible under equity rule No. 37 (198 Fed. xxviii, 115 C. C. A. xxviii). Whether or not an order shall be made allowing intervention within the purview of that rule is a matter which requires careful consideration, but one formal application has been made this morning, and upon that point I will consider the subject and in due course determine what shall be done. There is no time limit to be placed upon any application for intervention. Such an application may be made at any time pending the litigation; but it would conduce to the orderly administration of this estate if all those who desire to move for intervention would move with reasonable promptness after they shall have made up their minds as to the course they wish to pursue so that all concerned, including the court, may know within a reasonably short time who are made parties to the litigation, and may likewise know the extent or limit of any order which the court may file in that regard. I therefore hope that by the 3d day of February, 1919, which I believe is on a Monday, that all persons desiring to intervene will move accordingly, although it is to be distinctly understood that any one who does not move by that date has the absolute right to move at any time during the pendency of the litigation, and I will hold in reserve as I look at it now, with the right, of course, to change my mind, the application made on behalf of the Public Service Commission in that regard.

In the conduct of quite a number of receiverships I have always required that notice be given to any responsible person or group of persons who are in one form or another interested in the litigation, whether their interest is of a character which comes within the equity rule to which I have referred or not. The files of this court will show that such has been the proceeding before me as well as before the

other judges in the court in a very considerable number of receiver-ships, and of course the receiver will be instructed in respect of any applications to the court, to notify the various representatives of committees and of the public bodies which have appeared here to-day. The receiver and the court will naturally be anxious to obtain from any of these creditors and public bodies any information or suggestion or advice which ultimately will go to the solution of the problems here involved. And meanwhile, as to the conduct of the receiver, no one need have any fear that there will be any step taken in this receivership, so far as the receiver and the court here are concerned, which will not be fully known and fully understood. I do not mean, by that, that it will be possible for the receiver and the court to consult with every person in regard to every small detail of daily operation, and for that matter I do not expect that any person of sufficient understanding and judgment to be worthy to be a receiver in this court will be called upon to consult the court as to what might be called the day by day ordinary conduct of the business of these corporations. The receiver was appointed, among other things, upon the theory that he would know, as any person at the head of an important transportation system ought to know, how to deal with the workaday problems that are presented in the operation and conduct of a transit system of this character. But anything that is in any sense substantial, which in any true sense affects not merely the operation of this important system as a system, but affects in a true sense the safety and comfort and the interest of the public at large, anything that is contemplated in such directions will be so thoroughly known and so thoroughly understood that no one can by any manner of means misapprehend that it is the purpose of the court and its arm, the receiver, to conduct this receivership in such manner as to make at least the people of the city a moral partner in the conduct of this receivership.

I think the time is here to depart a little bit from the narrow area of the determination of a motion, because this receivership has very important administrative requirements. Generally speaking, those not skilled in the law do not fully understand what a receivership is and what it means, and those of us who are either at the bar or on the bench are apt to take for granted a considerable amount of knowledge of those things which we must know professionally, and which perhaps others not trained in our profession are not so familiar with. It is very important at the outset of this receivership that there be neither misunderstanding nor misapprehension. The situation of this company may be said to have two general heads—what may be called the physical situation, and what may be called the financial situation.

In respect of the physical situation we have, first, the actual physical condition of these properties that are in the charge of the court. Very shortly after the present receiver was appointed he conferred with the court, and he was instructed by the court as one of the preliminary steps to endeavor to ascertain the physical condition of the transit system, so far as that transit system is under this receivership. I found that the receiver was highly sympathetic with the court's view. It is my desire that a complete physical survey shall be made of this system.

In view of the fact that a deplorable accident has occurred, it is important that every reasonable and humanly possible effort shall be taken that no such thing as that can occur upon this system again, while in any event this system is under the charge of this court. Obviously, where the blame lies for the accident is a matter for judicial determination in other tribunals, so far as fixing the legal liability is concerned in certain particulars. But at once the receiver will make every effort to have this physical condition known, so that all that can possibly be done with the funds at hand and with funds that it is necessary to be obtained shall be done to make this whole system safe for the carriage of the large numbers of our inhabitants and our visitors who are carried upon this system daily.

Desiring to avoid, if possible, any greater burden of expense upon these different companies than was necessary to incur, I have asked the receiver to request the Public Service Commission, and I understand he has so done, to assist him by having their expert men make this physical survey. That request thus made, as I understand, or in any event, to be made, was in a spirit of co-operation.

Utterly irrespective of whatever view may be held by contending parties as to one public body or another, this body is a body charged with certain duties under the law, and, so far as this receiver and this court is concerned, we both look to this body for co-operation, within those duties that it is called upon to perform; and it is our purpose to deal with the Public Service Commission so far as the court is concerned—and when I say the court necessarily I speak for the court's arm, its receiver—it is our purpose to deal with the Public Service Commission, not at arm's length, not with technical resistance, but in a co-operative spirit, desiring wherever possible to observe any requirements that in good judgment and in fair conclusion they deem proper, after an appropriate inquiry, to safeguard the lives and comfort of the traveling public in this city. The Public Service Commission will find upon the part of this receiver no effort technically to avoid whatever may be the proper and just efforts on the part of the Public Service Commission, designed, as I have repeatedly said, for the proper operation of this railroad from the standpoint of safety.

There is a second consideration under that general head. It must be the effort of the receiver, if possible, to attract the good will of those who are daily traveling upon this railroad. It is said—and I make no comment one way or the other—that there is a lack of kindly attitude on the part of the traveling public who use this system towards this road. If that be so, it is the duty and unquestionably the purpose of the receiver, as is well evidenced by his report, which he has gathered in the short time with commendable care—it is his effort, and must be his effort and his duty, to so conduct this railroad as to endeavor to give to the people traveling over it a service which they shall regard as reasonable and fair.

Of course, the result cannot be accomplished at once, because an ideal service will require doubtless a great deal yet to be done, and will require possibly more money than is now at hand. But I think, if it is understood that the receiver and the court approach the problem from

the point of view indicated, that any reasonable man, not misled by misapprehension or misunderstanding, will be very glad, day by day, to see improved conditions, rather than to see unsatisfactory service continued.

Now, in respect of the internal conditions of this company, I thought that the receiver should not make any radical changes, if at all, until after this motion shall have been heard. It seemed to me that it was perhaps inadvisable for him to endeavor to shape the internal policy of this company before he knew whether or not he was to be the single receiver or to be associated with others. Therefore I deemed it unwise that any steps should be taken which would be perhaps misunderstood from one quarter or another, and that, except in so far as imminent demands were to be met, he should endeavor to preserve the status quo until after the hearing and determination of this motion. He has already started to investigate the situation, and from the official of the highest standing in point of authority and compensation to the employé of the humblest duties the receiver will, of course, make a careful investigation, to see, first, what is the ability of the various officers and employés; secondly, what is their compensation; and, thirdly, what in right and justice should be done or should be recommended to be done. By that I do not wish to be understood— because I am talking very frankly—as thinking for one moment that under present conditions of living it would be possible or fair or right to reduce in any manner, shape, or form the present wage of the men who in one capacity or another—men and women, as trainmen and gatemen, and the like, persons working in the power houses and on the tracks—I do not think for one minute that those compensations should be reduced, not through any mere notion in my mind, but because with the present cost of living it is extremely desirous that a fair wage should be paid to these employés, most of whom, so far as I have been able to observe them, are earnest and intelligent and faithful, and who are entitled as a matter of health and safety to the public at large to be compensated at least at the rate at which they are now compensated, with no fear whatever of reduction in that regard. But in respect of others who can be replaced, the receiver, of course, will make a careful examination to ascertain what is best in the interest of the company and its creditors—whether its creditors be individuals or be public bodies—what is best to be done. So much for that.

Now, in respect of the financial situation, the arguments have merely confirmed, together with the report of the receiver laid upon my desk, the conclusion that here is a very difficult situation, but a situation by no means impossible of solution. It is a situation where there are various interests, and no one interest should justly be subordinated beneath its legal rights. By whatever name called, the city has a large interest, and so have those persons who have purchased these notes aggregating outstanding now some $57,000,000. So likewise have the stockholders, with their holdings of upwards of $70,000,000. So likewise have the creditors of all kinds, tort and contract. All these have interests, and they will never attain the right result unless their attitude towards each other is one of co-operation.

This receivership can be successful, and I trust will be successful. If it fails to accomplish what all right-minded men hold it is to accomplish, it will fail merely because, through no fault of its own, it does not receive co-operation in every quarter, public and private.

In respect of the financial situation, it was very well said I think by several of the counsel that the situation is quite different from that in which some previous railway situations were found. It is perfectly plain that there must be a result—if there is to be a result—in the readjustment of this company, by whatever name called, whether adjustment, or reorganization, or refinancing, which can be attained only by the concurrence of many elements. The kind of readjustment or reorganization, which is possible where only it is concerned with private individuals who hold securities or stocks, is not possible here in the sense that such an arrangement can be made as has frequently been made outside of the court. That problem is not at hand for the moment. But when the time comes that earnest men, representing all interests, public and private, shall seek to solve this problem, they may as well understand now, all of them, that in view, more especially, of the recent practices and decisions of this court, this receivership will not leave this court until any plan is thoroughly well understood by the court and has the court's approval. That is said because it is fair to state that no longer can those who are only privately interested, in the sense of being private persons—privately interested is not a good phrase; I mean those who are private persons—can no longer arrange the basis upon which the future of the company in receivership shall be conducted, without that basis being of a character which is satisfactory to the court, after full, free, and fair discussion on the part of every one who has a right to be heard.

Having thus, I think, made clear several of the views which the court entertains, and having by practically unanimous understanding made clear to the persons who are or will be tort claimants the position of the court, I come to the final question with which we are now to deal.

Any application on the part of the city of New York, or on the part of the Public Service Commission, is entitled to most careful and most respectful consideration. These gentlemen, who represent those two important public bodies, are either on the one hand the direct selection of the people, or on the other hand the selection of the people by the appointment of the Governor, as the statute provides. Any application which comes from such sources is not lightly to be laid aside. But both Mr. Bisbee and Mr. Erbe have put the matter very aptly. The argument of the learned counsel for the city and the learned counsel for the Public Service Commission indicates that there is lack of agreement between these two great bodies in some respects which were stated. One official thinks that the other body is not entitled to representation. One counsel thinks that, whatever else happens, there should at least be additional representation which would represent the city. I fear there has been a misapprehension as to what a receivership is. Under a receivership—I am stating the very simplest of principles—the property is taken into the possession of the court. It is the court's duty to

conserve the property while thus in its possession. The court has no power to break contracts. Valid outstanding contracts and obligations must be observed. In a situation of this kind there are obviously legal perplexities which will find their solution only in the determination of courts—in some instances perhaps in the determination of the United States District Court of the Southern District of New York; in other instances possibly by the determination of the New York courts. The receiver cannot favor or omit to favor either private or public creditors by any action on his part. He is not a law unto himself, any more than the court is. The receiver is merely the instrument of the court, because theoretically, if the court had the time, it would be the court's duty personally to administer itself the entire receivership.

I think the representatives of the city and of the Public Service Commission manifestly have some firm convictions as to the rights they represent and as to the policies which in their judgment should be pursued. Whether one or two additional men are appointed, it must be plain that it would be impossible for the court successfully or intelligently to conduct a complex receivership of this kind with other receivers, representing not the court, but representing some point of view which might or might not accord with the point of view entertained by the receiver appointed by the court. Such a situation is not known in receiverships. Such a situation might seriously tend to destroy the efficiency of the receivership, and a receivership especially of this character, and might transfer from a forum outside the receivership and the court the controversies which might properly be settled at some place and time other than by this court.

All that this receiver is called upon to do is what I have heretofore stated. He is called upon to see that the road gets into good physical condition, if in any respect anything in that regard is to be done. He is called upon to operate this road to the best of his ability. He is called upon to meet present obligations as best he can. He is called upon to borrow money, upon a proper showing that money is needed. He is called upon to use every effort within his power to obtain, with the aid of the proper officials, the completion of those parts of this road which are not yet constructed, and without which even any uniformed person must see that this road cannot reach its highest earning capacity, not to speak of its failure to supply to the people of the city those transportation facilities which they so hope for, and to which they are entitled.

To repeat again, the whole situation is one where the court is the receiver, and where the court is entitled to have as its aid at all times singularity of purpose. It must be quite plain that the court is unable at this time, either on the one hand to appoint a coreceiver, which would be simply having two men do what in the court's judgment in the circumstances of this case one man could competently do, or on the other hand, accepting, not the court's appointment, but the nomination by a public body of a gentleman charged with various responsible duties, who is necessarily very completely and greatly occupied otherwise, who shall act as receiver, not as the court's arm, but as representing

what is regarded as the rights of one of the very important units which have come into this situation.

I do not for a moment foreclose the proposition that there may readily come in the course of this receivership a time when one or more receivers may be regarded as helpful and necessary to the court. I can imagine that, when the time comes to work out the financial future of this company, the aid of a receiver representing at that time the united view of the public authorities may be of great service, and I do not wish to be understood as dealing with anything but the situation as it now stands upon this 15th day of January, 1919.

There may very well be a time—I repeat—when, especially in dealing with the financial situation, it may become extremely helpful and co-operative to have an additional receiver, but I do not see that that time is here at the moment. At this moment what this receivership is concerned with is to get down to business as fast as it can. It has already started. No one questions the standing and ability of this receiver.

I may add, however, for the information of those who perhaps for the moment have lost sight of the fact that one of the great elements of value to the court of this receiver, in addition to his known qualities of executive ability, is the fact that for many years he had the highly useful experience of being himself a chancellor, a judge of a court of equity, in a great court, which has had a reputation in the history of American jurisprudence second to none, in which court it was his duty to sit where I now sit in the sense of being an administrator, and in which court, through a long and varied experience, he became familiar with the obligations and duties which fall upon a court of equity in an administration of this character. I congratulate, not merely myself, but all those who are concerned, that it was possible to have a man of that peculiar equipment in this extremely important and delicate situation, willing to lay aside in great measure his private practice at the bar and devote himself, both as an administrator and as a former experienced judge, to the great problem with which he will have to deal.

In these circumstances, I deny the motion for a coreceiver without prejudice to its renewal at such time as counsel may be advised.